# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| MICHAEL G. FISCH, an individual, | No.  60644-5-II |
| Appellant, | |
| v. | UNPUBLISHED OPINION |
| FRR-HARMON, LLC, a Washington limited liability company, | |
| Respondent. | |

PRICE, A.C.J. — In 1997, Fred Roberson formed a Limited Liability Company (LLC) to buy and manage a building in downtown Tacoma.  The LLC was named FRR-Harmon, LLC, and its initial members were Roberson and his daughter, Laura Fisch.  From 1998 to 2002, Roberson purported to gift Laura's[1] then-husband, Micheal Fisch, a total of 100,000 Preferred Membership Units in FRR-Harmon.

After Roberson's death in 2022, FRR-Harmon denied that Fisch had any interest in the company.  Fisch sued FRR-Harmon for a declaratory judgment establishing he was a Preferred Member of FRR-Harmon based on possession of Preferred Membership Unit certificates and, based on that interest, for access to corporate records.  The superior court granted summary judgment in favor of FRR-Harmon and dismissed Fisch's claims.  Fisch appeals.

---

[1] Laura is primarily referred to as Laura Fisch in the record.  Laura and Michael have since separated, and it appears she changed her name back to Laura Roberson.  For clarity, we refer to Laura by her first name.  We intend no disrespect.

No. 60644-5-II

We hold that the statute of limitations and, alternatively, the doctrine of laches bar Fisch's claims. Therefore, we affirm.

FACTS

When Roberson formed FRR-Harmon, Roberson and his daughter, Laura, were the initial members; Roberson held a 99 percent interest and Laura held a 1 percent interest. The company's operating agreement created two classes of members: Members and Preferred Members. Article 7 of the operating agreement created 3,000,000 Preferred Membership Units, which the company could sell for $1 per unit.

"Schedule 1" of the operating agreement identified Roberson and Laura as Members, and Roberson as a Preferred Member. Although Schedule 1 included a line for the initial capital contribution for the Preferred Member, the line was left blank:

**Schedule 1**

**Member Information**

| Name | Address | Initial Capital Contribution | Percent Interest |
|------|---------|------------------------------|------------------|
| Fred R. Roberson | 1939 Commerce St. Tacoma WA 98402 | $ 693,000 | 99% |
| Laura Fisch | 1939 Commerce St. Tacoma WA 98402 | $ 7,000 | 1% |

**Preferred Member Information**

| Name | Address | Initial Capital Contribution |
|------|---------|------------------------------|
| Fred R. Roberson | 1939 Commerce St. Tacoma WA 98402 | $ _____ |

Clerk's Papers (CP) at 113.

2

Later, Roberson apparently wanted his family to have an interest in FRR-Harmon. Between 1998 and 2002, Roberson sent Fisch four certificates for 25,000 Preferred Membership Units each, totaling 100,000 Preferred Membership Units. Each certificate stated that Fisch was the owner of 25,000 Preferred Membership Units:

> The Limited Liability Company, organized under the laws of the State of Washington, is authorized to issue 3,000,000 Preferred Membership Units
>
> THIS CERTIFIES THAT *MICHAEL FISCH*, a married man, is the owner of TWENTY-FIVE THOUSAND (25,000) fully paid and non-assessable Units of Preferred Membership in the above Limited Liability Company, transferable only on the books of the Limited Liability Company by the holder hereof in person or by duly authorized attorney, upon surrender of this Certificate properly endorsed.

CP at 58-64. Roberson sent similar certificates to Laura and to Fisch and Laura's four children.

In September 2019, the FRR-Harmon operating agreement was amended to recognize Gary Davis as an Economic Interest Owner in the company.[2] The amendment to the operating agreement was a three-page document that expressly "deleted" the previous "Schedule 1" and "replaced" it with a new "Schedule 1." CP at 183. The amendment further confirmed that the new Schedule 1 "accurately reflect[ed] the ownership of the Company." CP at 183. The new Schedule 1 still identified Roberson and Laura as members with 99 percent membership interest and 1 percent membership interest respectively. But Roberson, Laura, and Davis were identified as having a 74, 1, and 25 percent economic interest respectively. The new Schedule 1 did not identify Fisch either as being a Preferred Member or as having any economic interest; in fact, no Preferred Members at all were identified:

---

[2] Davis was Roberson's brother-in-law. He received an economic interest in the company in exchange for performing contracting work for the company.

SCHEDULE 1
MEMBER INFORMATION

| Member/Interest Owner | Percent Membership Interest | Percent Economic Interest |
|---|---|---|
| Fred Roberson | 99% | 74% |
| Laura Fisch | 1% | 1% |
| Gary Davis | 0% | 25% |
| **Total** | **100%** | **100%** |

CP 185.

Roberson died in 2022. Subsequently, Fisch contacted the representatives of Roberson's estate about the certificates that purported to give Fisch an interest in FRR-Harmon and two promissory notes. One promissory note is not relevant to this case. The other promissory note, executed in December of 2005, stated that Roberson promised to pay $105,096 to Fisch at an interest rate of 4.5 percent. When Fisch contacted the estate, he demanded payment of the December 2005 promissory note in full and also demanded records from the company to determine his interest based on his Preferred Membership Units.

The Estate denied that Fisch had any valid Preferred Membership Units. The Estate claimed that the December 2005 promissory note had redeemed any Preferred Membership Units Fisch may have had, leaving Fisch with no interest in FRR-Harmon. And the Estate believed the December 2005 promissory note was no longer enforceable based on the statute of limitations. Nevertheless, the Estate offered to pay the initial face value of the promissory note to settle Fisch's claims.

In September 2023, Fisch filed a complaint against FRR-Harmon. Fisch claimed that he was entitled to (1) access company records under RCW 25.15.136, and (2) a declaratory judgment

confirming his ownership of 100,000 Preferred Membership Units and the corresponding interest in the company.

In January 2025, Fisch filed a motion for summary judgment. As support for his motion, Fisch provided the company's operating agreement, his Preferred Membership Unit certificates, and accounting and company records (received in discovery) that he contended supported his position.

The accounting records did provide some support for the transfer of Preferred Membership Units to Fisch. The records reflect the reduction of Preferred Membership Units apparently owned by Roberson by the same number of Preferred Membership Units he sent to his family. There was also a 2006 letter from the company's accountant, Ron Pemberton, to Roberson outlining Pemberton's belief that the company had some liability to Roberson's family based on Preferred Membership Units:

> Here are [the] schedules showing the yearly activity as reported to the IRS for the Preferred Membership Unit accounts and the Preferred Allocation of Profits (Deferred Premium) accounts.
>
> The Deferred Premium analysis shows that your account has had all prior year amounts fully paid out and that the accounts for your daughter and her family have had nothing paid out up through December 31, 2004 with a total for these accounts of $342,436.00 accumulated and unpaid.
>
> The Preferred Membership Unit analysis shows that your remaining balance is $242,474.00 as of December 31, 2004 and the total of your daughter and her family combined balance is $737,500.00
>
> I suggest that the LLC should begin to pay out to Laura and her family distributable cash to apply first against the Deferred Premium accumulated accounts until fully paid and then against your and their remaining balance of the Preferred Membership Unit balances. When these amounts are fully paid, distributions would begin to you and Gary Davis in the proportion of 75% and 25% from surplus cash.

CP at 134.

Fisch also provided a copy of Certificate No. 1 issued August 8, 1997, that purported to issue 1,236,633 Preferred Membership Units to Roberson. Fisch contended that this showed that Roberson had the Preferred Membership Units available to him to transfer to Fisch. The certificate, however, had "cancelled" written across the front:



CP at 171. There was no indication when "cancelled" was written on the certificate.

FRR-Harmon opposed Fisch's motion for summary judgment. FRR-Harmon argued that Fisch's claims failed as a matter of law because Roberson's attempted transfer of Preferred Membership Units was invalid under the terms of the operating agreement—specifically because Fisch was never a member of the company. Further, FRR-Harmon claimed that the Preferred Membership program had been cancelled and any outstanding Preferred Membership Units

Roberson believed he had transferred were redeemed in 2005. FRR-Harmon also argued that Fisch's claim was untimely under the statute of limitations and the doctrine of laches.

FRR-Harmon provided additional evidence in support of its argument that Roberson had redeemed Fisch's Preferred Membership Units through promissory notes. For example, FRR-Harmon provided the declaration of Mathew Shaw. Shaw, who took over as manager of FRR-Harmon in 2019, stated that Roberson had specifically told Shaw that "he had cancelled the Preferred Membership Unit program and that there were no Preferred Members of Harmon." CP at 435-36.[3] Shaw believed this statement was consistent with some handwritten notes he had found from Pemberton.

Pemberton's notes mentioned a promissory note to be paid from Roberson to Fisch for "Deferred Premium on Preferred Member Units 2005" in the amount of $71,028 and for "payment on redemption of Preferred Member Units 2005 held by LF & MF which payment was actually issued from FRRH LLC to Fred Roberson" in the amount of $34,068:

---

[3] Referencing this 2019 time period, Shaw stated in his declaration, "[A]fter Plaintiff raised the share certificate issue via e-mail, I asked Fred about this issue. Contrary to what Plaintiff indicated, Fred specifically told me that he had cancelled the Preferred Membership Unit program and that there were no Preferred Members of Harmon." CP at 435-36.

⑤ NIP for payment on redemption of Preferred Member Units 2005 held by LF & MF which payment was actually issued from FRRH LLC to Fred Roberson

FR to LF $30.211
FR to MF $34.068

CP at 487. This totaled $105,096 payable from Roberson to Fisch—the same amount of the December 2005 promissory note. Shaw explained that the three people from the company who would be best able to explain the certificates and promissory notes were unavailable: Roberson and Pemberton were dead, and the company's former attorney was "cognitively unavailable" due to medical issues. CP at 437.

FRR-Harmon also provided Fisch's deposition in which Fisch admitted that he was unsure whether the December 2005 promissory note was related to the Preferred Membership Units. Fisch also could not remember whether the promissory note had been paid or not.

FRR-Harmon also presented additional evidence in support of its untimeliness arguments. Fisch admitted that he never received any distributions from FRR-Harmon and never received any tax documents related to an interest in FRR-Harmon. Fisch also never received notice of any annual meeting of FRR-Harmon, nor did he ever attend such meetings.

FRR-Harmon also provided correspondence from Fisch that identified concerns related to the Preferred Membership Units as early as 2006. In October 2006, Fisch had e-mailed Pemberton stating that he had received no tax documents and complaining that "phantom income" from FRR-Harmon was resulting in a tax liability with "no cash." CP at 429 (internal quotation marks omitted). Then, in March 2013, Fisch's financial advisor, Kristopher Grimmer, asked Pemberton

8

about the Preferred Membership Units. Grimmer advised Fisch that, following this inquiry, he was unable to obtain certain records, but he learned that distributions were likely made from the company to Roberson and Davis that Preferred Members should have shared in.

The 2013 e-mail from Fisch's financial advisor, Grimmer, does not appear to be referenced in the portions of Fisch's deposition provided in the record. However, Fisch referenced the 2013 e-mail in a declaration in which he disputed statements from Laura that he had "never mentioned an ownership interest in FRR-Harmon." CP 559, 617. Fisch's declaration also attached a 2019 "wealth statement," which appeared to reference Pemberton and Grimmer's 2013 e-mail to Fisch. The 2019 wealth statement indicated that the Preferred Membership Units were "gifts" from Roberson, but that their value and what was owed was uncertain.[4] CP at 621.

Further, FRR-Harmon presented 2019 correspondence between Fisch and Shaw that showed that Fisch had received and reviewed the 2019 amended Schedule to the operating agreement. By the time of his deposition, Fisch said that he had no memory of reviewing the

---

[4] The 2019 wealth statement footnote read, in part:

> The units were received by each Donee via gifts by Fred Roberson (25K units gifted to each Donee in 1998, 1999, 2000, and 2002). . . . Apparently, there may have been distributions that were made from FRR-Harmon to Fred and/or Gary that the preferred membership unit holders should have shared in. . . . Per Ron Pemberton on 3/9/13, Fred is to speak with MGF before Ron is to provide the record of Preferred Membership Units to IFO. In discussion with Ron Pemberton on 3/9/13, he gave the impression that the number of Preferred Membership Units owned may be greater than what we are reporting, especially for LRF. When asked about the approximate FMV of the units, Ron was not sure; he however thought they were worth close to Fred's cost at the time of gift of $1.00/unit.
>
> CP at 621.

amended schedule, except for remembering that it was part of refinancing the building.[5]  Fisch

further stated that he did not think that he made any request that the amended Schedule 1 identify

him as a member, but he had no specific memory.

After a hearing, the superior court granted summary judgment in favor of FRR-Harmon as

the nonmoving party and dismissed Fisch's claims.  Fisch appeals.

ANALYSIS

Fisch appeals the superior court's order granting summary judgment in favor of FRR-

Harmon and dismissing his claims.  FRR-Harmon argues that Fisch's claim to a membership

interest is barred by the statute of limitations because Fisch was aware of facts giving rise to his

claim, at the latest, in 2013.  Alternatively, FRR-Harmon argues Fisch's claim is barred by the

doctrine of laches.  We agree and affirm.

I. STATUTE OF LIMITATIONS

FRR-Harmon claims that Fisch's claims are barred by the six-year statute of limitations in

RCW 4.16.040.  RCW 4.16.040 provides,

> The following actions shall be commenced within six years:
>
> (1) An action upon a contract in writing, or liability express or implied arising out
> of a written agreement, except as provided for in RCW 64.04.007(2).

Here, Fisch is suing to determine his rights and FRR-Harmon's liabilities based on written

agreements—the operating agreement and the Preferred Membership Unit certificates.  Thus,

RCW 4.16.040 applies.

---

[5] Although Fisch claimed during his deposition that he had no memory of his 2019 correspondence with Shaw that included the amended Schedule 1, he confirmed, after reviewing the correspondence, that he was "sure" he did correspond with Shaw about it.  CP at 413.

Whether an action is barred by the statute of limitations depends on when the plaintiff's cause of action accrued. *Haslund v. City of Seattle*, 86 Wn.2d 607, 619, 547 P.2d 1221 (1976). The general rule is "that a cause of action accrues and the statute of limitations begins to run when a party has the right to apply to a court for relief . . . ." *Id*. Under the discovery rule, "a cause of action does not accrue until a party knew or should have known the essential elements of the cause of action," although it does not require the plaintiff to recognize the legal consequences of the claim. *Green v. A.P.C.*, 136 Wn.2d 87, 95, 960 P.2d 912 (1998).

A party may not remain passive when they are exposed to information suggesting a cause of action. "[A] cause of action may accrue for purposes of the statute of limitations if a party *should have* discovered salient facts regarding a claim." *Id.* When "a plaintiff is placed on notice by some appreciable harm occasioned by another's wrongful conduct, the plaintiff must make further diligent inquiry to ascertain the scope of the actual harm." *Id.* at 96. " '[O]ne who has notice of facts sufficient to put him upon inquiry is deemed to have notice of all acts which reasonable inquiry would disclose.' " *Id.* (quoting *Hawkes v. Hoffman*, 56 Wash. 120, 126, 105 P. 156 (1909)).

Here, Fisch's declaratory judgment claim accrued at the point when a genuine dispute over Fisch's interest in the company arose. *See Coppernoll v. Reed*, 155 Wn.2d 290, 300, 119 P.3d 318 (2005). The court in *Coppernoll* held that a plaintiff has a justiciable declaratory judgment claim when there is " '(1) . . . an actual, present and existing dispute, or the mature seeds of one, as distinguished from a possible, dormant, hypothetical, speculative, or moot disagreement, (2) between parties having genuine and opposing interests, (3) which involves interests that must be direct and substantial, rather than potential, theoretical, abstract or academic, and (4) a judicial

determination of which will be final and conclusive.' " *Id.* (alteration in original) (internal quotation marks omitted) (quoting *To-Ro Trade Shows v. Collins*, 144 Wn.2d 403, 411, 27 P.3d 1149 (2001)). But under the discovery rule, the statute of limitations on Fisch's claim would begin to run when Fisch was placed on notice that there were inconsistencies in FRR-Harmon's actions that required Fisch to make a diligent inquiry that would have revealed that there was a genuine dispute. *See Green*, 136 Wn.2d at 96.

FRR-Harmon argues that the statute of limitations has run because it has been more than six years since Fisch was aware of several issues related to the distributions, but he never pursued or further investigated those claims. Specifically, FRR-Harmon identifies two points in time when Fisch's claims could have accrued. First, FRR-Harmon argues that Fisch's claims accrued as early as 2006 when Fisch e-mailed Roberson's accountant with concerns about lack of distributions. Second, FRR-Harmon argues that Fisch's claims accrued, at the latest, in 2013, when Fisch's financial advisor, Grimmer, raised concerns about distributions being made to Roberson and Davis that Preferred Members should have shared in. In other words, FRR-Harmon argues that the statute of limitations began running, at the latest, in 2013 because of Fisch's obligation to make a diligent inquiry.

Fisch responds that his cause of action did not accrue until 2023 when FRR-Harmon "repudiated" Fisch's alleged interest in the company.[6] Br. of Appellant at 46-47. Fisch suggests that a failure of a company to make appropriate distributions would not trigger the statute of

---

[6] To the extent that Fisch relies on an analogy to quiet title actions to argue that there is no applicable statute of limitations, this comparison is unpersuasive. A declaratory judgment action based on written agreements is not a quiet title action. And as discussed above, there are established legal principles on how to apply the statute of limitations with written agreements.

limitations for his claim; only when there is a "definitive repudiation of future performance" would his cause of action accrue. Reply Br. at 26.

Fisch's position is unpersuasive. Fisch was well aware that he had never received any distributions related to his certificates or, for that matter, any other indication that the company considered him to be a member or economic interest holder. This complete lack of performance over time by FRR-Harmon was sufficient to put Fisch on notice that diligent inquiry was necessary to determine the status of Fisch's interest in FRR-Harmon.

Fisch had an obligation to engage in a diligent inquiry, at the latest, when he was made aware by Grimmer's 2013 e-mail to him that distributions made by the company were not consistent with Fisch's alleged Preferred Membership interest. Despite this knowledge, Fisch took no action to investigate or resolve the discrepancy. Underscoring Fisch's inaction is the 2019 wealth report's reference to the 2013 e-mail. Notwithstanding that it was dated six years later, the 2019 wealth report referenced the 2013 e-mail's discussion of the company's failure to pay on the alleged gifts of the Preferred Membership Units. Had Fisch taken any action of significance in response to Grimmer's raising concerns in 2013, one would expect that the 2019 document would reference those actions; but, instead, it merely repeats the representations in the 2013 e-mail.

Thus, Fisch was clearly on notice in 2013 of the potential that FRR-Harmon's actions were inconsistent with his asserted Preferred Membership interest to such a degree that he was under an obligation to engage in a diligent inquiry. *See Green*, 136 Wn.2d at 96. If Fisch had engaged in such a diligent inquiry in 2006 or 2013, it is likely that Fisch would have discovered that the discrepancies in accounting and distributions were related to Roberson's intent to redeem the Preferred Membership Units through promissory notes in 2005. With this information, it would

have been clear that there was a genuine dispute about Fisch's belief that possession of the Preferred Membership Unit certificates established he had a Preferred Membership (or Preferred Economic) interest in FRR-Harmon. As a result, the statute of limitations began to run, at the latest, in 2013, and it would have expired in 2019, four years before Fisch filed his 2023 complaint. *See Green*, 136 Wn.2d at 96. Accordingly, Fisch's declaratory judgment claim is barred by the statute of limitations.

## II. DOCTRINE OF LACHES

Alternatively, Fisch's claim is untimely under the doctrine of laches. Setting aside Fisch's obligation to inquire in 2013, Fisch certainly had a reasonable opportunity in 2019 to discover that FRR-Harmon did not recognize that he had any interest in the company when Fisch had access to the 2019 amended operating agreement and Schedule 1, which failed to list any preferred members at all. Despite being armed with this information, Fisch failed to take any further action until 2023 when documents were missing and witnesses were unavailable. Accordingly, we alternatively hold that the doctrine of laches bars Fisch's declaratory judgment claim.

The doctrine of laches implies waiver of claims based on the plaintiff's knowledge of existing conditions and acquiescence in them during the passage of time. *McFarland v. Tompkins*, 34 Wn. App. 2d 280, 307, 567 P.3d 1128 (2025). The party asserting laches bears the burden of proof:

> A party asserting the defense of laches bears the burden to prove: (1) knowledge or reasonable opportunity to discover on the part of a plaintiff that he or she has a cause of action against a defendant, (2) an unreasonable delay by the plaintiff in commencing that cause of action, and (3) damage to the defendant resulting from the unreasonable delay.

*Id.* Damage to the defendant can result from a change of circumstances. *Id.* "Laches is an extraordinary defense appropriately applied only when the condition of the other party has in good faith become so changed that the party cannot be restored to his or her former state." *Id.*

Similar to its argument regarding the statute of limitations, FRR-Harmon argues that Fisch's claims are barred by laches because Fisch was on notice well before his lawsuit that the company denied his claim to be a Preferred Member. And, further, Fisch's delay caused damage because all of the knowledgeable witnesses—Roberson, Pemberton, and the company lawyer— have either died or are unavailable. According to FRR-Harmon, this context is appropriate for the extraordinary defense of laches.

Fisch responds that the doctrine of laches is inapplicable because he had no knowledge of his claims until FRR-Harmon expressly rejected his claim of ownership interest based on the Preferred Membership Unit certificates. Further, Fisch contends that FRR-Harmon is benefitting from the delay by profiting from its refusal to pay required distributions or validly redeem the Preferred Membership Units.

We agree with FRR-Harmon. As noted above, there is no evidence that the company overtly disavowed the validity of the certificates or any interest created by them until Fisch directly contacted Roberson's estate in 2023 about the interest in the Preferred Membership Unit certificates. Nevertheless, Fisch was clearly aware that he was not receiving any distributions or any other indication that his alleged ownership interest was recognized by the company. Moreover, Fisch had access to and apparently reviewed the 2019 amended Schedule 1, which, significantly, did not recognize Fisch as having either a Preferred Membership interest or a Preferred Economic interest.

Even if Fisch's obligation to diligently investigate the discrepancies in FRR-Harmon's treatment of his alleged Preferred Membership interest did not trigger the statute of limitations (which we hold it did), laches, with its focus on the equities, is applicable. These equitable considerations focus on whether there was unreasonable delay. Here, there was. Fisch was certainly aware that FRR-Harmon had never paid distributions nor treated him as having any membership interest in the company (did not amend the schedule, did not obtain the consent of other members, did not provide notice of annual meetings, etc.) for more than 20 years. And, still, he took no action to resolve the discrepancy. And by 2019, Fisch had access to the amended Schedule 1—information definitively establishing that the company did not recognize any membership or economic (preferred or otherwise) interest Fisch held in the company. Overall, it was unreasonable for Fisch to fail to take any action to resolve the apparent discrepancies until 2023.

Moreover, resolving these apparent discrepancies would not have been difficult. If Fisch had engaged in any reasonable inquiry after reviewing the amended Schedule 1, he would have learned that Roberson considered the units cancelled, redeemed, or otherwise no longer creating a valid membership or economic interest. For example, Shaw obtained this information in 2019 merely by asking Roberson a simple question. Fisch's failure to make a similar inquiry (while Roberson was still alive) created an unreasonable delay.

Also, unlike the statute of limitations, the damage caused to the defendant by the unreasonable delay is relevant to the doctrine of laches. As a direct result of Fisch's failure to take any action, relevant company records have been destroyed or lost and, significantly, the witnesses that could provide relevant evidence and explanations are no longer available. Both parties are

left with limited evidence, faded memories (including Fisch's own), and unavailable witnesses. It is unfair to expect FRR-Harmon to be able to reasonably defend Fisch's claims with limited evidence, especially when this litigation was not initiated until after the key witnesses who could have explained, or even resolved the dispute, are dead or otherwise unavailable.

Fisch engaged in an unreasonable delay by failing to take any actions to resolve known discrepancies related to his claimed ownership of the Preferred Membership Units for at least four years and at most over 20 years, resulting in prejudice to FRR-Harmon's ability to effectively defend his claims due to loss of key evidence and witnesses. Thus, application of the doctrine of laches to bar Fisch's declaratory judgment claim is an appropriate alternative to dismissal based on the statute of limitations.

## III. CLAIM TO INSPECT RECORDS

Fisch also argues that the superior court erred when it dismissed his claim for inspection of the company records based on RCW 25.15.136(1)-(2) and section 6.4 of the operating agreement. We disagree.

Under RCW 25.15.136(2), a member of a limited liability company may inspect and copy company records:

> On ten days' demand, made in a record received by the limited liability company, a member may inspect and copy, during regular business hours at the limited liability company's principal office, the records required by subsection (1) of this section to be kept by a limited liability company.

And consistent with this statute, the operating agreement provides members with the right to inspect company records:

17

6.4 Inspection of Records. Upon reasonable request, each Member or Preferred Member shall have the right to inspect and copy at such Member or Preferred Member's expense, during ordinary business hours, the records required to be maintained by the Company pursuant to Section 12.5.

CP at 93 (boldface omitted).

Fisch argues that he was a Preferred Member, and therefore, he was entitled to inspect company records under RCW 25.15.136 and section 6.4 of the operating agreement.

Because Fisch's declaratory judgment claim to establish a membership interest in FRR-Harmon is barred by the statute of limitations and, alternatively, the doctrine of laches, Fisch cannot establish that he is a member of FRR-Harmon. Without being able to establish that he is a member or a Preferred Member, Fisch has no right to inspect or copy records under either RCW 25.15.136(2) or section 6.4 of the operating agreement. Thus, the superior court properly granted FRR-Harmon's motion for summary judgment on Fisch's claim to request records.[7]

CONCLUSION

Fisch's claim to establish a membership interest in FRR-Harmon is barred by the statute of limitations and, alternatively, the doctrine of laches. As a result, Fisch cannot establish that he

---

[7] We also note that, during oral argument, Fisch conceded that he received all relevant records from the company during discovery. Wash. Ct. of Appeals oral argument, *Fisch v. FRR-Harmon*, No. 60644-5-II (Apr. 27, 2026), at 4 min., 37 sec. to 4 min., 42 sec., *audio recording by* TVW, Washington State's Public Affairs Network, http://www.tvw.com (m-download.invintus.com/9375922947/2f3ce34c3933ae5c5ba74e1373e3d6b78d34403_audio.mp3. An issue is moot if a court can no longer provide effective relief. *Maldonado v. Maldonado*, 197 Wn. App. 779, 790, 391 P.3d 546 (2017). Although Fisch asserts that his claim to inspect records is not moot because we could still acknowledge his right to inspect records, this claim more accurately fits within his declaratory judgment claim. Oral argument, *Fisch*, No. 60644-5-II, at 4 min., 42 sec. Thus, even if Fisch's claim to inspect records was not resolved by the statute of limitation, it would be moot because he has already obtained and inspected all records that would be provided.

No. 60644-5-II

is a member of FRR-Harmon that is entitled to inspect company records. Accordingly, we affirm summary judgment.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

PRICE, A.C.J.

We concur:

MAXA, J.

GLASGOW, J.